IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HOUSE NURSERY, LTD.** | § | Case No. 13-60690 |
| xx-xxx2747 | § | |
| P. O. Box 110, Brownsboro, TX 75756 | § | |
| | § | |
| Confirmed Liquidating Debtor | § | Chapter 11 |

# **MEMORANDUM OF DECISION**[1]

This matter is before the Court to consider the Motion to Enforce Plan Provisions filed by the confirmed liquidating Debtor, House Nursery, Ltd. ("Debtor") and the objection filed thereto by Regions Bank, a secured creditor (the "Bank"). The Motion seeks a declaration and enforcement of certain terms of the Chapter 11 plan of reorganization that was confirmed in this Court by an order entered on May 27, 2014, which the Debtor asserts imposes a duty upon Regions Bank to foreclose upon certain properties and, more significantly, requires the Bank to apply credits to the debts owed by the Debtor to the Bank in amounts designated in the confirmed Plan. At the conclusion of the hearing, the Court granted the parties leave to file supplementary arguments and authorities regarding the proper interpretation of the Confirmation Order, and thereafter took the matter under advisement. This Memorandum disposes of all issues pending

---

[1] This Memorandum of Decision is not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or other evidentiary doctrines applicable to the specific parties in this proceeding.

before the Court.[2]

## Factual and Procedural Background[3]

The Debtor, House Nursery, Ltd., is a limited partnership which operated a wholesale and retail plant nursery business in Henderson, Smith, and Kaufman counties. On August 30, 2013, it filed a voluntary petition for relief under Chapter 12 of the Bankruptcy Code which was subsequently converted to Chapter 11 on October 18, 2013. Regions Bank has been the primary secured creditor of the Estate, secured by certain crops and crop-related collateral, as well as by a first lien upon certain tracts of real property located in Kaufman County and Smith County, respectively.

At an early stage of the Chapter 11 proceeding, the Debtor concluded that a reorganization of its business affairs as an operating entity was not feasible, and it began to pursue the orderly liquidation of its assets. On December 20, 2013, the Debtor, as plan proponent, filed its original plan of liquidation which provided for "the orderly liquidation of the Debtor's assets and the distribution of the net proceeds to holders of Allowed Claims in accordance with the priority scheme established by the Bankruptcy

---

[2] This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §1334(b) and 28 U.S.C. §157(a). The Court has the authority to enter a final order in this contested matter since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A) and (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court. Further, the Court has inherent jurisdiction to interpret its own confirmation order. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) and cases cited therein.

[3] The facts presented are those which stand uncontested between the parties or appear as a matter of objective record in the above-referenced case and which give context to the given dispute. No factual determinations have been rendered.

Code, as authorized by Section 1123(b)(4) of the Bankruptcy Code and other applicable law."[4] The original plan generally contemplated that the Debtor would be given prescribed periods of time within which it would take particular steps to liquidate the collateral held by the Bank in order for the Debtor to realize what it believed to be a significant amount of equity for the benefit of priority and general unsecured creditors, while simultaneously generating funds to pay 100% of the allowed secured claim of the Bank.[5]

The Bank quickly responded to the proposed liquidation scheme. In its own words, the Bank contended to the Court that

> [T]he Plan is not fair and equitable because it places significant risk on Regions, notwithstanding the Debtor's assertion that it will (eventually) pay Regions's claim in full. Specifically, the Plan proposes to liquidate Regions's collateral for an undisclosed amount, free and clear of liens and without any mechanism for Regions (or some other unbiased third party) to monitor and object to the sale methodology as it progresses. This unspecified and unmonitored process also leaves Regions (and the Court) unable to determine whether Regions ultimately will be paid the value of its claim, as required under section 1129(b)(2)(A) of the Bankruptcy Code. Moreover, the Plan is not feasible because it is unclear whether the selloff will be completed within a reasonable period of time. Over the course of the selloff, the Debtor proposes to retain all funds (with the exception of minimal monthly interest payments) until the Distribution Date, which is an unspecified date in the future that the Debtor chooses to distribute funds. This is a recipe for inefficiency and has great potential for Regions to lose

---

[4] *Chapter 11 Plan of House Nursery, Ltd.* filed on December 20, 2013 [dkt #81] at p. 1.

[5] *Id*. at Art. VII and ¶ 6.2.

its right to collect on the value of the collateral as the Debtor spends sale proceeds on unspecified liquidation expenses until such time that it determines to make a distribution.[6]

As frequently happens in Chapter 11 cases, this initial conflict began a significant period of negotiations between the Debtor and the Bank regarding modifications to the proposed sale mechanisms, the results of which were reflected in the subsequent amendments to the plan proposal filed with the Court. The Debtor's First Amended Plan as proposed specified that interim distributions would be made to the Bank as the collateral was sold,[7] it outlined a significantly expanded process for the sale of the collateralized inventory,[8] and expected completion dates for particular categories of collateral were proposed.[9] Those negotiated changes were carried forward into the proposed Second Amended Plan in which the proposed dates for conclusion of the respective sales periods were also altered[10] and a required monthly payment to the Bank from the sale of inventory after the effective date of the plan was added.[11]

After the Debtor's Second Amended Plan was filed, the accompanying Amended

---

[6] *Regions Bank's Objection to Disclosure Statement* filed on February 11, 2014 [dkt #93] at p. 2.

[7] *First Amended Chapter 11 Plan of House Nursery, Ltd.* filed on March 4, 2014 [dkt #96] at p. 4.

[8] *Id*. at ¶ 7.2.

[9] *Id*. at ¶¶ 7.1 - 7.3.

[10] *Second Amended Chapter 11 Plan of House Nursery, Ltd.* filed on March 21, 2014 [dkt #100] at ¶¶ 7.1 - 7.3.

[11] *Id*. at ¶ 7.2.

Disclosure Statement was approved and the Court set a hearing to consider confirmation of the Second Amended Plan for May 6, 2014.[12] Ongoing plan negotiations were occurring between the Debtor and the Bank up to the eve of the scheduled confirmation hearing. The parties agreed that the plan objection deadline would be extended for the Bank in an attempt to reach a final agreement on the final terms of the plan.[13] Last minute agreements were reached and the final written terms were tendered to the Court on the day prior to the confirmation hearing.[14] Among the last-minute plan modifications to which the Debtor and the Bank agreed were changes to the process for the liquidation of the real property tracts which were subject to the Bank's lien. The changes to ¶ 7.1 were outlined in blue in the written amendments and read as follows:

> **7.1 Sale of Real Property:** The Real Property, to the extent not already sold or subject to an Order Approving Sale at the time of confirmation of the Plan, will be marketed for sale through a realtor licensed in the State of Texas, and will be sold to the Person making the highest cash offer, subject to ten (10) days' prior notice to the

---

[12] *See "Order Approving Debtor's Second Amended Disclosure Statement; Fixing Time for Filing Acceptances or Rejections of Debtor's Proposed Second Amended Chapter 11 Plan and/or Objection to Confirmation of Proposed Plan and Setting Hearing to Consider Confirmation of Debtor's Proposed Second Amended Chapter 11 Plan"* entered on March 24, 2014 [dkt #102].

[13] *Transcript of May 6, 2014 Confirmation Hearing* [dkt #112] at p. 6.

[14] *See "Non-Adverse Amendments to Second Amended Plan of House Nursery, Ltd"* filed on May 5, 2014 [dkt #107]. As described by the Bank's counsel at the confirmation hearing:

> Mr. Binford: The negotiations came down to the wire I would say, and at this point that's why a ballot wasn't submitted, but I am here this morning to announce that we are – I am here this morning to announce that we are – Regions is in support of the plan as amended, and [I] would like to offer my oral support as a ballot in favor of the plan as amended.

*Transcript of May 6, 2014 Confirmation Hearing* at 6:13-18.

Post-Confirmation Service List and approval of the Bankruptcy Court. A Claimholder having a Secured Claim may submit a bid for the Real Property and may bid the amount of its Allowed Secured Claim. It is contemplated that in marketing and selling the real property owned by Debtor, qualified purchasers may wish to buy, in addition to real property, certain inventory equipment and other personal property such as greenhouses or other miscellaneous assets. Debtor, in consultation with its professionals, will duly consider all offers with the intent of maximizing the return to the estate and its creditors. Debtor expects that sales of real property sufficient to pay any remaining claims will be completed by February 28, 2015~~July 31, 2015.~~ The Plan provides, in part, for Debtor to sell real property, a portion of which is pledged to Regions as collateral. In the event that any parcel of real property upon which Regions has a first lien has not sold as of February 28, 2015, or subject to a court approved sales agreement which has not yet closed as of February 28, 2015, or at such earlier time that Debtor notifies Regions in writing that continued sales efforts are not economically beneficial or in the best interest of the estate, Regions or its designee may foreclose on the following pledged properties in the following agreed minimum amounts, provided that the balance owed Regions on its allowed claim has not otherwise been paid prior to foreclosure:

    (i)    $978,000 for that certain tract identified as the Tyler 30.322 acres as described on Exhibit "A" to this Order;

    (ii)    $300,000 for that certain tract identified as the Kaufman 19.21 acres as described on Exhibit "B" to this Order;

    (iii)    $300,000 for that certain tract identified as the Kaufman 4.87 acres as described on Exhibit "C" to this Order.[15]

The Court approved the proposed modifications under Fed. R. Bankr. P. 3019(a) without necessity of further disclosure and directed that further modifications be made to limit the scope of the Court's post-confirmation supervisory functions regarding the proposed sales of property. As so modified, the proposed plan was orally confirmed, but the Court required the Debtor to incorporate all of the last-minute changes into a "clean" copy to be denominated as a "Third Amended Plan" and filed for Court review prior to the entry of any confirmation order. The Third Amended Plan was filed on May 22, 2014.[16]

---

[15] *See Attachment to "Non-Adverse Amendments to Second Amended Plan of House Nursery, Ltd"* filed on May 5, 2014 [dkt #107] at pp. 11-12.

[16] See dkt #108.

As set forth in the Third Amended Plan, paragraph 7.1 reads as follows:

> **7.1 Sale of Real Property:** The Real Property, to the extent not already sold or subject to an Order Approving Sale at the time of confirmation of the Plan, will be marketed for sale through a realtor licensed in the State of Texas, and will be sold to the Person making the highest cash offer, subject to ten (10) days' prior notice to the Post-Confirmation Service List and approval of the Bankruptcy Court. A Claimholder having a Secured Claim may submit a bid for the Real Property and may bid the amount of its Allowed Secured Claim. It is contemplated that in marketing and selling the real property owned by Debtor, qualified purchasers may wish to buy, in addition to real property, certain inventory equipment and other personal property such as greenhouses or other miscellaneous assets. Debtor, in consultation with its professionals, will duly consider all offers with the intent of maximizing the return to the estate and its creditors. Debtor expects that sales of real property sufficient to pay any remaining claims will be completed by February 28, 2015. The Plan provides, in part, for Debtor to sell real property, a portion of which is pledged to Regions as collateral. In the event that any parcel of real property upon which Regions has a first lien has not sold as of February 28, 2015, or subject to a court approved sales agreement which has not yet closed as of February 28, 2015, or at such earlier time that Debtor notifies Regions in writing that continued sales efforts are not economically beneficial or in the best interest of the estate, Regions or its designee may foreclose on the following pledged properties in the following agreed minimum amounts, provided that the balance owed Regions on its allowed claim has not otherwise been paid prior to foreclosure:
>
> > (i) $978,000 for that certain tract identified as the Tyler 30.322 acres as described on Exhibit "A" to this Order;
> >
> > (ii) $300,000 for that certain tract identified as the Kaufman 19.21 acres as described on Exhibit "B" to this Order;
> >
> > (iii) $300,000 for that certain tract identified as the Kaufman 4.87 acres as described on Exhibit "C" to this Order.
>
> In the event of a dispute regarding the allocation of sale proceeds derived from the sale of property which is partially collateralized to Regions, either the Reorganized Debtor or Regions may seek a determination from the Bankruptcy Court to resolve such allocation issues. No court approval will otherwise be required for the sale of any estate property but Debtor shall provide Regions with fourteen (14) days written notice prior to closing of any sale.[17]

Following its review of the restated terms, the Court entered an "Order Confirming Third Amended Plan of Reorganization" on May 27, 2014.[18]

---

[17] *Id.* at pp. 11-12.

[18] See dkt #110.

In implementing the plan, the Debtor was unable to procure at an acceptable price a buyer of the parcels of real estate securing its indebtedness to the Bank. When the Debtor tried to tender the properties back to the Bank pursuant to the procedure prescribed by the confirmed plan, the Bank "refused to accept such properties at the tendered prices."[19] Unable to resolve the impasse, the Debtor filed the present Motion to Enforce Plan Provisions in order to compel the Bank to accept the properties and to credit the Debtor's indebtedness at the values set forth in the confirmed plan. The Bank objects to the Motion based upon the argument that the literal language of the confirmed plan does not actually require it to foreclose on the real estate and provide credit to the Debtor at the designated prices, but rather places that as an option that it can exercise in its sole discretion. It cites the Court to the literal language of ¶ 7.1 which reads, in relevant part: ". . . Regions or its designee *may* foreclose on the following pledged properties in the following agreed minimum amounts . . ."[20]

## Discussion

*Applicable Legal Standards*

Bankruptcy plans are interpreted in accordance with the general rules of contract interpretation. *LRI III v. Halla (In re LRI III, Ltd.),* 464 F. App'x. 263, 267 (5th Cir. 2012) (citing *McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335 (5th Cir.

---

[19] See Debtor's *Motion to Enforce Plan Provisions* at ¶ 4.

[20] See *Third Amended Chapter 11 Plan of House Nursery, Ltd.* filed on May 22, 2014 [dkt #108] at ¶ 7.1 (emphasis added).

1995)).  "[C]ourts regularly apply principles of contract interpretation to clarify the meaning of the language in reorganization plans."  *Compton v. Anderson (In re MPF Holdings US, LLC)*, 701 F.3d 449, 457 (5th Cir. 2012).

The principles of contract interpretation in this context are derived from Texas law. *LRI III*, 464 F. App'x at 267.  Texas law provides that a "written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the limitations of the parol-evidence rule."  *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014). "To achieve this objective, courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless."  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis in original).  It is "the universal rule in this jurisdiction that an instrument . . . must be viewed in its entirety and that no single portion, sentence, or clause when considered alone will control."  *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962). "Indeed, courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract."  *Frew v. Janek*, 780 F.3d 320, 328 (5th Cir. 2015) [construing Texas law].  Texas courts traditionally "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive."  *Frost Nat. Bank v. L & F Distributors, Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (internal quotations omitted).  "If, after the pertinent

rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law." *Id.*; *IQ Holdings, Inc. v. Stewart Title Guar. Co.*, 451 S.W.3d 861, 869 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

In that construction effort, "[f]acts and circumstances that may be considered include the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction." *Myer*, 440 S.W.3d at 22, citing 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 32.7 (4th ed. 1999). "The [parol-evidence] rule does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011). "But while evidence of circumstances can be used to inform the contract text and render it capable of only one meaning, extrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity." *Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015). "If a written instrument is so worded that a court may properly give it a certain definite legal meaning or interpretation, it is not ambiguous. On the other hand, a contract is ambiguous only when the application of the applicable rules of interpretation to the instrument leave it genuinely uncertain which one of the two meanings is the proper meaning." *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex. 1980).

Thus, ambiguity should not be easily found. "Ordinarily the writing alone is

sufficient to express the parties' intentions, because it is the objective, not subjective, intent that controls." *Wolf Hollow I, L.P. v. El Paso Mktg., L.P*, 472 S.W.3d 325, 333 (Tex. App. – Houston 2015, pet. filed) (*citing Matagorda Cty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006)). Thus, "[a] contract is not ambiguous simply because the parties disagree over its meaning," *Dynegy Medstream Servs., Ltd. P'ship v. Apache Corp*., 294 S.W.3d 164, 168 (Tex. 2009), or "because the parties advance conflicting interpretations of the contract." *Lopez v. Munoz, Hockema & Reed, L.L.P*., 22 S.W.3d 857, 861 (Tex. 2000). "Whether a contract is ambiguous is . . . a legal question for the court." *Kachina Pipeline*, 471 S.W.3d at 449 (citing *Dynegy,* 294 S.W.3d at 168).

Those objective construction principles, particularly those which endorse the consideration of the surrounding circumstances in order to give context to the contract interpretation, are particularly relevant to the construction of the terms of a confirmed Chapter 11 plan. Unlike the typical scenario in which parties create a contract by reaching the proverbial "meeting of the minds" based upon their own private interests, there is no binding contract in the plan confirmation context without the approval of the bankruptcy court. Several procedural steps have to be observed and, notwithstanding any agreement reached by affected parties, the court has the duty of ensuring compliance with various statutory provisions required for the confirmation of a Chapter 11 plan. That process results in an unusual occurrence — the significant disclosure of relevant, objective information in the public domain regarding the process that led to the ultimate formation and approval of the new contract, i.e., the confirmed plan — an access that is rarely

available in the formation of private contracts. Thus, the factual background derived from the public record as outlined in the preceding section that led to the confirmation of the Debtor's Chapter 11 plan of liquidation is not forbidden extrinsic evidence,[21] but rather a survey of objective, surrounding circumstances derived from the Court's docket that inform the proper interpretation of the resulting contractual text.

      Texas courts have long observed "the rule that the courts in construing contracts are to determine the intention of the parties from the contract as a whole and then adopt that definition which is most consistent with such intent and will render the questioned term harmonious with, rather than repugnant to, the other provisions of the contract." *Myers,* 361 S.W.2d at 197. That rule in this context dictates that the Debtor's interpretation of the relevant plan provisions is the correct one. All of the circumstances leading up to the final agreement, that was jointly announced by the parties at the plan confirmation hearing and incorporated into the confirmed Third Amended Plan, reflect that the revised Article VII was a culmination of the Bank's ongoing efforts to achieve two objectives: (1) to impose chronological limits upon the Debtor's liquidation process; and (2) to define precise results in the event that such efforts proved unsuccessful, thereby actually providing to both parties

---

[21] The Debtor inexplicably urged the Court to allow the introduction of oral testimony as a purported aid to the construction of this contract, notwithstanding the general rule that, upon introduction of extrinsic evidence, the wording in the instrument will be construed against its author. However, that rule is applicable only when an agreement remains ambiguous after the ordinary rules of interpretation have been applied. *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (Tex. 1951). Thus, if this Court is misconstruing the surrounding circumstances which gave rise to the parties' agreement, that still does not render the contract ambiguous. It simply gives rise to an alternative interpretation that this Court rejects – that the term "may" is a term of discretion which does not bind the Bank to anything.

a degree of certainty regarding the cessation of the liquidation period that was lacking in prior plan proposals. The disputed text, as understood in light of the surrounding circumstances, reveals a plan that is outlining a chronological period under which the Debtor will be allowed to market the properties in an effort to obtain whatever equity could be realized within that designated marketing period. Those agreements are correspondingly also defining the period in which the Bank will be contractually precluded from exercising its foreclosure rights against the affected properties. However, once the chronological period has expired, the revised Article VII is contractually concluding the liquidation process and defining the final result. Thus, in this context, contrary to the present contentions of the Bank after-the-fact, the term "may" is not a term evidencing its discretion; but rather it is a term evidencing permission or authority to exercise a right from which it had been previously precluded. The contractually-negotiated time allotted to the Debtor to try to realize the equity from its real estate holdings has expired and at such time the Bank is authorized to proceed to foreclosure with the Debtor being entitled to a credit on each property in the designated, negotiated, amount.

    That predesignated outcome is precisely the way the negotiated revision of Article VII was presented to the Court during the confirmation hearing. On at least two occasions during that hearing, the Debtor's counsel, outlined how an unsuccessful liquidation attempt would result in a defined, definite outcome, without any rejection, refutation, or

contradiction of that analysis by the Bank's counsel at the hearing.[22]  Indeed, based upon the parties' presentation and explanation of the newly-reached agreement, even the Court, in discussing with both counsel the scope of its post-confirmation role under the revised plan, summarized that "it seems to me that the plan [as] now contemplated . . . is contemplating the floor under which if not sold the property goes back to Regions and how does that effect the estate and the liability of the estate to Regions."[23]

Thus, notwithstanding its use of the term "may foreclose," ¶ 7.1 of the Third Amended Plan was not merely randomly listing (with strangely specific assigned values) only one of various options that the Bank was free to select at that time, but rather that section was dictating the agreed final adjustment of the debtor-creditor relationship

---

[22] Mr. Kelley: . . . but effectively the purpose [of the textual changes] is that for the real estate of (sic) which Regions has a lien, and that is designated in – in the amendments that the Debtor has essentially until the end of February 2015 – that's February 28, 2015, to either complete a sale of that property . . . but that in the event that we have not reached a milestone that there are – that there are prices at which – at which Regions will take the property, but they will post a foreclosure, and that they will bid it in at not less than that amount.

*Transcript of May 6, 2014 Confirmation Hearing* at 7:22 -8:9.

Mr. Kelley: . . . after the inventory sales, assuming that there are no real estate sales at that point, (sic) are still the collateral which Regions has with regard to the real estate. I have given the – both the disposition values and the market values.  Those [market values] are from the May 30th, 2013 Jim Justiss appraisals which have previously been admitted into this court from previous hearings, and the disposition values are the values at which Regions has agreed to take to — for minimum foreclosure values in the event that none of this is sold by the end of February of 2015 . . . ..

*Id.* at 18:21-19:6.

[23] *Id.* at 13:13-17.

between the Debtor and the Bank at the end of the liquidation period in the event that the affected tracts of real property were unable to be sold within the designated chronological period. Adopting that interpretation would totally negate the applicability and significance of the negotiated values with which the Bank agreed to credit the outstanding indebtedness once the designated marketing period had expired and the Bank was no longer precluded under the plan from exercising its foreclosure rights. It would also annul the negotiations between the parties for the establishment of a firm termination date for the Debtor's liquidation effort since, if the Bank were to forego its option to foreclose, the Debtor would retain its ownership rights and continue to accrue post-confirmation obligations. Such a scenario is inconsistent with the objective facts surrounding the formation of this contract and it violates the prime directive to "consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker,* 650 S.W.2d at 393 (emphasis in original).

The Court understands the appeal of a simpler resolution and, notwithstanding the fact that its use would neuter other provisions of the contract, the Bank contends that the term "may" should always be given its general discretionary meaning. However, such an elemental approach is rejected by Texas law when the context of the contract dictates otherwise. In such circumstances, "no single portion, sentence, or clause [or word] when considered alone will control" over the context provided by the entirety of the contract. *Myers,* 361 S.W.2d at 196; *see also Frew,* 780 F.3d at 328. For example, in *Ramsay v. Texas Trading Co.*, 254 S.W.3d 620, 630-31 (Tex. App. – Texarkana 2008, pet. denied),

the Texas Court of Appeals, in construing the use of the term "may" in a forum-selection clause, noted its duty to "look at the entire sentence (and not just the word 'may') and determined that, in context, the parties intended a mandatory effect. As it concluded,

> [W]e agree that the use of the word "may" in this clause, while intending mandatory effect, is unfortunate. The word ordinarily suggests a conditional or possible result rather than a mandatory one. Although we agreed that the word "may" makes interpretation of this clause challenging, we find from the context that the parties intended to make the forum mandatory once ADM made its choice. Otherwise, the words giving ADM discretion to choose would mean nothing.

*Id.* at 631.

Similarly, in the present context, the use of the term "may foreclose" is unfortunate and perhaps can be attributed to the last-minute nature of the negotiations and the subsequent plan production which might have precluded a careful linguistic review. What is clear, however, from the entirety of the contract and the circumstances surrounding the confirmation of this plan is that the termination of this liquidation process as contemplated in ¶ 7.1 of the plan was not left to any party's discretion. The foreclosure of the Bank's liens on the affected properties would proceed if there was no closed or pending sale by February 28, 2015, and, in such event, the negotiated prices to be credited to the Debtor upon each foreclosure as set forth in ¶ 7.1 would be invoked to reach a final determination of the indebtedness owed to the Bank at the end of the designated liquidation period.[24] That

---

[24] Thus, the need for the oral concession by Debtor's counsel at the confirmation hearing that, in the event that the stipulated value was in excess of the amounts then owing on the Bank's allowed secured claim at the time of foreclosure, the Bank would not be responsible for the arithmetic excess and would owe the Debtor nothing — essentially as a penalty for the Debtor's failure to market the properties

was the intent of the parties as expressed in this confirmed plan.  That was the intent of the parties as expressed without contradiction at the confirmation hearing.  That recognized intent harmonizes all of the relevant provisions of this contract and protects the legitimacy of all stated provisions.

Though it is now apparent that, with the benefit of hindsight, the Bank is not pleased with the deal it made because the results it expected from the negotiated marketing scheme have not materialized, the Bank cannot simply isolate chosen words now from the context from which they arose and thereby achieve a different result from that contemplated by the parties at the time of the confirmation of the plan.  Due to the principles of res judicata, it does not possess such discretion.  *CHS, Inc. v. Plaquemines Holdings, L.L.C.*, 735 F.3d 231, 239-40 (5th Cir. 2013) ["The legal ramifications of a confirmed reorganization plan are highly significant. . . . [A] confirmed plan . . . is subject to a myriad of statutory requirements and is an order of the court given *res judicata* effect."]; *accord, United Indep. Sch. Dist. v. Vitro Asset Corp. (In re Vitro Asset Corp.)*, 539 B.R. 108, 116 (N.D. Tex. 2015).

**Conclusion**

Accordingly, the Motion to Enforce Plan Provisions filed in the above-referenced case by the confirmed debtor, House Nursery, Ltd., is granted.  Regions Bank shall, within fourteen (14) days of the entry of this Order, comply with the terms of the confirmed plan

---

more effectively in the designated chronological period.   *Id.* at 8:10-25.

of liquidation in this case and accept from House Nursery, Ltd. the tender of the tracts of real property referenced in ¶ 7.1 of the confirmed Third Amended Plan; and the indebtedness of House Nursery, Ltd. to Regions Bank, as reflected in the allowed secured claim held by Regions Bank pertaining to such tracts of real property, shall be credited in the amounts as set forth for each respective property in ¶ 17 of the Order Confirming Third Amended Plan of Reorganization, and the exhibits thereto, as entered by this Court on May 27, 2014.  An appropriate order will be entered which is consistent with this opinion.

Signed on 02/09/2016

/s/ Bill Parker
THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE